Weatherwax, 7 Paige, 182. Consequently we must assume, in support of plaintiff's title, that it was the intention of the testator at the time he made this will to devise the fee to the collateral relatives or kindred of his first wife, as well as to his own kindred, in case his son should have no children born to him; for if the word "heirs" is to be taken in its primary legal sense, it would include them all. To hold that such was the testator's intention, to deprive his own heirs of the whole or a portion of his estate, and to give it to strangers in blood without any expressions indicative of such purpose, would be in violation of well-settled rules of construction, and contrary to the will of the testator. There is nothing in the will indicating that the testator intended that his first wife's relatives should have any part of his estate by virtue of the terms of the will, or even his own brother or kindred. Such an intention cannot be inferred from the clause "children or heirs." The reports are full of instances where the word "heirs" has been construed to mean "children," heirs of the body, issue, and descendants. When that word is connected with the word "children," it is clearly evinced that it was used by a testator in its popular, common, or ordinary sense and meaning, as issue, etc., and not in its broad, general, comprehensive, legal, or technical sense, as heirs generally, and especially so when we consider the surrounding facts and circumstances, the particular relationship of the testator to the parties to this action, the fact that his first wife died 20 years before the making of the will, and that neither she nor her relatives were mentioned in the will.

It is difficult to draw any substantial distinction between a devise to "children and heirs" and a devise to "children or heirs" of a life tenant, and to hold that in the one case the word "heirs" is but another designation for "children or issue," while in the other it means heirs generally. Such a distinction would be more fanciful than real. However, there are many instances where the word "or" has been construed "and," and there is ample warrant for substituting the one for the other in this case, in order to effectuate the intention of the testator and to accomplish the purpose he had in view. The fee descended to the persons who were the heirs of the testator at the time of his decease, and the heirs of Stephen take nothing. It follows that the plaintiff has no title, and the demurrer must be sustained, with costs to the defendants.

Argued before DWIGHT, P. J., and LEWIS and BRADLEY, JJ.

Henry M. Davis, for appellant.

Artemus A. Bradley, for respondents.

PER CURIAM.    Judgment affirmed on opinion of GREEN, J., at special term.

---

### WHITE CORBIN & CO. v. JONES.

(Supreme Court, General Term, Fifth Department. April 12, 1895.)

1. CORPORATIONS—LIABILITY OF STOCKHOLDER.

In an action to enforce the liability of a stockholder under Laws 1848, c. 40, as amended by Laws 1853, c. 333, making stockholders liable for debts of the corporation where all the stock has not been paid in full, except that there shall be no such liability as to stock issued in payment for property to the amount of the value thereof, evidence as to the value of the property in payment for which the stock was issued, and as to the contract made by the trustees of the corporation with the owners of the property bought, is admissible.

2. SAME—SUBSEQUENT PURCHASERS.

The fact that stock issued for property at an excessive valuation was afterwards transferred to an innocent purchaser does not relieve such purchaser from the liability created by the statute.

Appeal from circuit court, Monroe county.

Action by White Corbin & Co. against William Martin Jones. From a judgment entered on a verdict in favor of plaintiff, and from an order denying a motion for a new trial, made on a case and exceptions, and on the ground of surprise and newly-discovered evidence, defendant appeals.    Affirmed.

The opinion of Mr. Justice Rumsey, denying the motion for a new trial, is as follows:

This action was brought against the defendant, who was a stockholder in the Rochester Printing & Lithographing Company, to recover a debt of that company by reason of the defendant's liability as a stockholder, under section 10 of the manufacturing corporations' act (Laws 1848, c. 40, § 10). The language of that section is: "All the stockholders of every company incorporated under this act, shall be severally individually liable to the creditors of the company in which they are stockholders, to an amount equal to the amount of stock held by them respectively, for all debts and contracts made by such company, until the whole amount of capital stock fixed and limited by such company shall have been paid in." The plaintiff, which was a creditor of the Rochester Printing & Lithographing Company, claimed that the liability of the defendant existed because, at the time of the organization of the company, the stock was issued in payment for property sold to the company at a fraudulent overvaluation, and for that reason the stock was not in fact fully paid stock. The defendant himself, as was conceded, was no party to the fraudulent transaction, and did not become a stockholder until a considerable time after the organization of the company.

By chapter 333 of the Laws of 1853, the trustees of such a corporation were permitted to purchase the property necessary for their business, and issue stock to the amount of the value thereof in payment therefor. When that has been done, if one who is a creditor of the corporation tries to insist upon the individual liability of the stockholder under section 10 of chapter 40 of the Laws of 1848, he is bound to prove—First, that the stock issued exceeded in amount the value of the property in exchange for which it was issued; and, second, that the trustees deliberately, and with knowledge of the real value of the property, overvalued it, and paid in stock for it an amount which they knew was in excess of its actual value. Iron Co. v. Drexel, 90 N. Y. 87, 92. It will be observed that the transactions which are to be investigated to enable the plaintiff to establish these facts must have taken place at the time when the property was bought and stock issued in payment for it, and the creditor is bound to establish that at that time there was an overvaluation to the knowledge of the trustees, by which the assets of the company were deliberately sacrificed. It follows that the evidence must be directed to the occurrences of that time, for those occurrences are the ones to be explained. The plaintiff must show the value of the property at that time, and he must also show by competent evidence that the trustees, knowing the actual value, intentionally overvalued it, and issued stock for it at the overvaluation. Any testimony which goes to show what was the true value of the property at that time is competent. So, also, it is competent to show what contract was actually made by the trustees with the owners of the property bought, and what consideration was paid to them, and the way in which the consideration was paid, because all those things are material as bearing upon the intention with which they paid in stock more than the value of the property. So, also, the knowledge of the trustees, and their deliberate intention at that time to buy the property at a fraudulent overvaluation, must be proven; and any testimony which is competent upon that point is competent in the action.

These considerations necessarily dispose of nearly all the exceptions which were taken in the case as to the admission of evidence. For instance, Pitt, upon his examination, was asked what was his opinion of the value of the assets of the Willard, Pitt & Moore business, which were turned over to the corporation, at the time when they were so turned over. That evidence called for precisely one of the facts which the court of appeals says must be proved by the plaintiff to establish his cause of action. It called for the opinion of

the witness as to the value of certain assets which were turned over, at the time when they were turned over.

There were several exceptions to the conversations which were had between the different directors at the time when the property was bought and stock turned out for it. The persons between whom these conversations were had were owners of the property bought, and directors of the company as well. It was necessary for the plaintiff to show that these people knew at the time that the property was overvalued, and what was said and done at the time when they entered into the transaction was clearly competent to show not only their knowledge which they expressed at that time, but also their intention. Loos v. Wilkinson, 110 N. Y. 195, 211, 18 N. E. 99, and cases cited. So, also, it was competent to show the disposition which was made of the assets, as bearing upon the good faith of the whole transaction on the part of the trustees.

It was claimed on behalf of the defendant that the good will of the several partnerships which were turned over to the Rochester Printing & Lithographing Company was of such value that, in addition to the actual value of the assets of those establishments, it was equal to the amount of stock which was paid for them. To meet this claim on the part of the defendant, it was competent for the plaintiff to show that these partnerships and corporations, which were consolidated into the Rochester Printing & Lithographing Company, were doing a losing business, because that bore directly upon the value of their good will. The other exceptions which were taken are covered by the considerations hereinbefore expressed.

It is claimed by the defendant that no liability against him can exist under this section, because it is not alleged or proved that he was a party to the overvaluation, but, on the contrary, it appears that he bought the stock after the property had been purchased and the stock had been issued to pay for it, and that the liability can only be based upon the fraud of the defendant. It would perhaps be sufficient to say upon this subject that no such point is raised by any motion made by the defendant in the case. If it had been, it is possible that evidence might have been given to charge the defendant with a knowledge of the condition of affairs at the time he bought the stock. But, passing that point, I am of opinion that the liability existed against every one who purchased stock issued in the same way in which this was issued, without regard to any knowledge he may have had upon the subject. Section 10 of the statute which has been quoted above establishes a liability against "all stockholders." Under that section, every man who bought stock of a manufacturing corporation was liable for the debts of the company until the certificate provided in that section shall have been filed. All that it was necessary for him to know, to find out whether or not he was liable, was to ascertain whether the certificate had been filed. If it had, he was not liable; and, if it had not, he was liable. By the law of 1853, a new power was granted to the trustees. It was no longer necessary for them to require the payment in money of the stock which was issued. They might, under that statute, issue stock to the value of the property bought, in payment for such property; and, in the certificate which they filed that the stock was paid up, the manner of payment must be reported according to the fact. Laws 1853, c. 333. When stock was issued under that permission of the statute, it became paid-up stock, not necessarily by the filing of the certificate, but by the filing of a certificate which was true. Any one who had occasion to buy stock issued in that way was bound not only to see that the certificate had been filed, but was bound, at his peril, to ascertain whether or not the certificate represented the truth, and that the property which had been taken in payment of the stock was worth the stock which had been delivered for it. This construction of the statute is, it seems to me, plain and clear. It was the one which was adopted by the judge in the case of Iron Co. v. Drexel, supra; and it was the only construction upon which that case could have been submitted to the jury. I can find in no case which has been reported any suggestion that a stockholder who buys stock issued in this way is not liable if the stock was issued at an overvaluation. In several of the cases cited by the defendant's counsel the defendant himself was one of the parties consenting to the overvaluation, and in these

cases the court says that it was necessary to prove that the defendant knew of it. But that was said because the defendant was one of the parties to the transaction. Undoubtedly, the liability thus created is a grave one, and it may in some cases, as possibly it did in this case, work an injustice to the individual stockholder. But it is within the plain construction of the statute, and therefore it cannot be escaped.

So far as the motion for a new trial in this case is made upon the ground of newly-discovered evidence, the papers are fatally defective. There is no statement anywhere in the papers of what the newly-discovered evidence is, except the paper which is said to be in the handwriting of Pitt, stating that there was a small amount of money on hand when a dividend was declared, at a time when he swore there was no money in the treasury of the company. But, if it could be assumed that this paper established that fact, it would be a matter of no importance whatever. If the fact had appeared, according to the statement in the paper, there is no probability that it would have changed the result of the trial; and, if it should be made to appear upon a new trial, I cannot see how it would have any effect whatever. There is no statement of any other evidence which was newly discovered.

The defendant also asks for a new trial upon the ground that the jury misunderstood the charge of the court, and that their verdict was based upon such a misunderstanding. To this part of the motion there are several serious objections. In the first place, there is no competent evidence to prove the fact. If the affidavits of the jurors had been offered to establish that their verdict proceeded upon a mistaken view of the law, they could not have been read. Clum v. Smith, 5 Hill, 560. Nor can such facts be established by the declarations of the jurors, made after the verdict had been rendered, to other persons who embody them in an affidavit. Mitchell v. Carter, 14 Hun, 448. But, passing that objection, it is very clear that no intelligent person could have misunderstood the direction given the jury. The charge upon the point referred to was clear, and was reiterated; and it appears, from the testimony of one of the jurors, not only that he made no such declaration as is stated in the affidavits, but that the jury did understand the charge of the court, and based their verdict upon the directions which they received.

Argued before DWIGHT, P. J., and LEWIS, BRADLEY, and WARD, JJ.

W. Martin Jones, in pro. per.
David Hays, for respondent.

PER CURIAM. Judgment and order affirmed, on opinion of Rumsey, J., at circuit.

---

## NEW YORK CENT. & H. R. R. CO. v. DAVIS.

(Supreme Court, General Term, Fifth Department. April 12, 1895.)

1. PRINCIPAL AND AGENT—LIABILITY OF UNDISCLOSED PRINCIPAL.
Defendant delivered coal to the L. R. Co., to be transported to a point on plaintiff's line, which connected with the L. road. The consignee had no interest in the coal, but merely handled it at his docks for defendant, charging him a certain sum per ton. The contract with the L. Co. only required it to transport the coal to the point at which its road connected with that of plaintiff, and to request plaintiff to transport it thence to its destination. *Held*, that the L. Co. was defendant's agent for the purpose of delivering the coal to plaintiff, and requesting its transportation from the connecting point, and the fact that plaintiff at the time did not know that defendant was owner of the coal was immaterial.

2. CARRIERS—LIEN FOR FREIGHT—DELIVERY TO CONSIGNEE.
On an issue as to whether a carrier, by delivery to the consignee, had lost his lien for freight, it appeared that the car loads of coal on which the